**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JEFFREY D. KERNS,**

        **Plaintiff,**

      **v.**                            **Civil Action 2:16-cv-57
                                             Judge James L. Graham
                                             Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

**<u>REPORT AND RECOMMENDATION</u>**

        Plaintiff Jeffrey D. Kerns filed this action under 42 U.S.C. §§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

    **I.**    **BACKGROUND**

        **A.  Prior Proceedings**

        Plaintiff applied for benefits on June 13, 2012, alleging a disability onset date of August 10, 2011. (Doc. 9-4, Tr. 206 , PAGEID #: 243). His application was denied initially on August 22, 2012 (Doc. 9-2, Tr. 112, PAGEID #: 147), and upon reconsideration on October 22, 2012. (*Id.* at Tr. 126, PAGEID #: 161). Administrative Law Judge Jeffrey P. La Vicka (the "ALJ") held a hearing on March 28, 2014 (Doc. 9-1, Tr. 66, PAGEID #: 100), after which he denied benefits in a written decision on May 14, 2014 (*id.* at Tr. 37, PAGEID #: 71). That decision became final when the Appeals Council denied review on November 23, 2015. (*Id.* at Tr. 1, PAGEID #: 35). Plaintiff now appeals. (Doc. 9 (administrative record); Doc. 10 (statement of

errors); Doc. 12 (response)).

### B.  Testimony at the Administrative Hearings

Plaintiff's counsel began the hearing by stating that Plaintiff's severe impairment was his residual complex regional pain syndrome with associated saphenous neuropathy.  (Doc. 9-1, Tr. 68, PAGEID #: 102).  Counsel further explained that Plaintiff's complex regional pain syndrome resulted from a procedure performed on August 22, 2011.  (*Id.*).  This date, counsel argued, was Plaintiff's alleged onset date.[1]

Plaintiff testified that he was 34 years old, 5'10", and weighed 215 pounds.  (*Id.* at Tr. 68, PAGEID #: 102).  He explained that he is unable to stand or sit in a chair for an extended period of time because he experiences burning in his right leg, knee, foot, and toes.  (*Id.* at Tr. 77, PAGEID #: 111).  Plaintiff further testified that he has "severe numbness" from his foot to his thigh and he experiences side effects from the medications he takes, which include tiredness, "trouble getting [his] thoughts together," and memory loss.  (*Id.*).  At the time of the hearing, Plaintiff stated his pain was "like an eight or nine" on a scale of zero to ten.  (*Id.* at Tr. 84, PAGEID #: 118).

In terms of daily activities, Plaintiff reported he is able to drive 2-3 times per week in order to go to the store, bank, post office, as well as visit with friends and family.  (*Id.* at Tr. 70–71, PAGEID #: 105–06).  Plaintiff also testified that he is able to run the dishwasher, make his bed, feed his dog, and can walk up "three little steps" to get into his house 3-4 times a week. (*Id.* at Tr. 69, 80–81, 83, PAGEID #: 103, 114–15, 117).  However, Plaintiff said he could not do

---

[1]Despite previously stating that August 22, 2011 was the alleged onset date, the ALJ stated that disability began on August 10, 2011 (Doc. 9-1, Tr. 37, PAGEID #: 71), and Plaintiff agreed in his Statement of Errors that his onset date was in fact August 10, 2011.  (Doc. 10 at 2).  Accordingly, the Court treats the alleged onset date for purposes of this Report and Recommendation as August 10, 2011.

laundry, vacuum, sweep floors, take out the garbage, or walk his dog.  (*Id.* at Tr. 81, 83, PAGEID #: 115, 117).  When asked how long he could sit without his leg elevated, Plaintiff responded "[p]robably 25, 30 minutes, maybe."  (*Id.* at Tr. 87, PAGEID #: 121).

When asked by the ALJ about any assistive devices, Plaintiff stated "I have to use my crutches all the time.  I can only walk a very short distance.  I mean, maybe to the bathroom or something in my house, you know, across the room or something.  But other than that I have to use my crutches."  (*Id.* at Tr. 83, PAGEID #: 117).  During the hearing, the ALJ questioned Plaintiff's counsel at length in an effort to find where in the record it was prescribed that Plaintiff must use crutches.  (*See id.* at Tr. 88, PAGEID #: 122).  Plaintiff's counsel eventually conceded that there was no prescription for crutches.  (*Id.* at Tr. 90, PAGEID #: 124) ("In terms of crutches are mentioned there's no, your honor, there's no specific, I'm prescribing him to be on crutches").

### C.  Relevant Medical Background

On February 23, 2010, Plaintiff injured his right knee while working for the City of Springfield as a police officer.  (Doc. 9-6, Tr. 528, PAGEID #: 568).  After numerous MRIs and appointments with several doctors, Plaintiff underwent a right knee arthoscopic excision of hypertrophic medial plica and synovium with chondroplasty on August 9, 2010, performed by Dr. Paul A. Nitz.  (*Id.* at Tr. 329, PAGEID #: 368).  On December 20, 2011, after several follow-up appointments, Dr. Nitz eventually released Plaintiff to full duty.  (*Id.* at Tr. 334, PAGEID #: 373).

On June 30, 2011, Plaintiff saw orthopaedic surgeon Dr. Frank R. Noyes for his continuing knee pain.  (*Id.* at Tr. 604, PAGEID #: 643).  Dr. Noyes recommended an MRI scan,

3

Plaintiff's fifth scan since his initial injury, to assess the articular cartilage. (*Id.*). The MRI performed on July 15, 2011, revealed an inferior patellar ridge chondral ulcer and irregular articular cartilage thinning (*id.* at Tr. 347, PAGEID #: 386), along with a mild medial meniscal stranding. (*Id.* at Tr. 600, PAGEID #: 639). During his follow-up appointment with Dr. Noyes on July 21, 2011, the MRI scan was discussed and it was determined that Plaintiff was a candidate for arthroscopy. (*Id.*). On August 22, 2011, Plaintiff underwent a second right knee surgery, specifically, an osteochondral autologous transplant system (OATS) procedure. (*Id.* at Tr. 349, PAGEID #: 388). After the surgery, Dr. Noyes noted that Plaintiff was to use "bilateral axillary crutches and instructed to maintain a nonweight bearing format for four weeks in order to allow more sufficient healing []." (*Id.* at Tr. 588, PAGEID #: 627).

Upon the direction of Dr. Noyes, Plaintiff began physical therapy on August 26, 2011, at Wheeling Hospital Outpatient Physical Therapy. (*Id.* at Tr. 413, PAGEID #: 452). Over the next four months, Plaintiff attended twenty-three physical therapy sessions. (*Id.* at Tr. 374, PAGEID #: 413). Throughout this time, Plaintiff was advised to put more and more weight on his leg and "wean" off crutches. (*See id.* at Tr. 373–413, PAGEID #: 412–452). For example, on October 12, 2011, Plaintiff was "allowed 25% weightbearing increase per week and is currently at quarter weightbearing." (*Id.* at Tr. 403, PAGEID #: 442). Notes from a therapy session on October 20, 2011, state Plaintiff was "allowed to be weightbearing between 25 and 50% per Dr. Noyes recommendations." (*Id.* at Tr. 400, PAGEID #: 439).

At a follow-up appointment with Dr. Noyes on November 17, 2011, it was noted that Plaintiff was still on crutches and could place "three-fourths percent of his weight on the lower extremity but unable to place full weight." (*Id.* at Tr. 583, PAGEID #: 622). Dr. Noyes also

4

stated that "due to the complex regional pain syndrome, [Plaintiff] would not be able to do a sitting job at this point" but "he also has not reached maximum medical improvement at this point," and "he should be able to do a sit down job in the near future." (*Id.*).  Physical therapy notes from November 22, 2011, stated Plaintiff "is allowed full weight bearing" although he "continues with crutches and weight bearing as tolerated." (*Id.* at Tr. 389, PAGEID #: 428). Finally, at two therapy sessions on November 29, 2011, and December 8, 2011, respectively, it was noted that Plaintiff was weaning from his crutches. (*Id.* at Tr. 383, 387 PAGEID #: 422, 426).

On December 23, 2011, Plaintiff fell on his kneecap in his mother's kitchen and consequently stopped going to physical therapy. (*Id.* at Tr. 379, PAGEID #: 418).  As a result of his fall, Dr. Noyes ordered another MRI on Plaintiff's knee to rule out any medial meniscus tears. (*Id.* at Tr. 581, PAGEID #: 620).  The MRI showed, among other things, no ligament tear or meniscal tear, a healed or nearly healed appearance of the osteochondral harvesting and implantation sites of the OATS procedure, and smooth appearance of cartilage. (*Id.* at Tr. 424, PAGEID #: 463).  There was no mention of any abnormal findings. (*Id.*).

In a subsequent appointment on February 16, 2012, Dr. Noyes stated that "it was obvious to [him], and other doctors examining this patient, that there was a definite area and definite syndrome of a complex regional pain syndrome occurring." (*Id.* at Tr. 580, PAGEID #: 619). Accordingly, Dr. Noyes believed it would be best for Plaintiff to see Dr. Hammam Hadi Akbik, a pain management specialist, to treat the features of complex regional pain syndrome ("CRPS"), since he believed "that the intraarticular pathology had been addressed and the ongoing symptomology was related to CRPS." (*Id.* at Tr. 302, PAGEID #: 341).  Dr. Noyes concluded

5

that patient was unable to work at that time as a result of his pain stemming from CRPS.  (*Id.* at Tr. 580, PAGEID #: 619).

Plaintiff saw Dr. Akbik on January 12, 2012.  (*Id.* at Tr. 480, PAGEID #: 519).  During the evaluation, Plaintiff had full range of motion of the right knee with some restriction on flexion, along with full strength in his right lower extremity.  (*Id.*).  It was determined at that appointment that a sympathetic nerve block would be scheduled upon approval by worker's compensation to help with Plaintiff's pain.  (*Id.*).  This course of treatment was "strongly support[ed]" by Dr. Noyes.  (*Id.* at Tr. 580, PAGEID #: 619).  In later appointments with Dr. Akbik, specifically on April 5, 2012 and June 12, 2012, it was noted that Plaintiff was able to perform numerous activities independently, such as bathing, dressing, and walking, (*id.* at Tr. 477, 485, PAGEID #: 516, 524), and that Plaintiff was "encouraged to consider vocational rehab as an alternative to disability."  (*Id.* at Tr. 478, 487, PAGEID #: 517, 526).  Further, Dr. Akbik stated Plaintiff's gait was steady and he was able to perform heel/toe gait.  (*Id.* at Tr. 478, PAGEID #: 517).

Plaintiff additionally saw Dr. Howard A. Pinsky for an independent medical examination on April 19, 2012.  (*Id.* at Tr. 301, PAGEID #: 340).  At the appointment, Plaintiff stated his pain was a "9/10" and was "constant in nature."  (*Id.* at Tr. 302, PAGEID #: 341).  Further, Plaintiff explained that "he uses a knee brace on an as needed basis" and "uses a wheelchair and a scooter, crutches and a walker."  (*Id.*).  Dr. Pinsky ultimately concluded that Plaintiff's ongoing problems were the result of complex regional pain syndrome and opined that Plaintiff could never, push, pull, squat, kneel, stand, or walk.  (*Id.* at Tr. 303, 305, PAGEID #: 342, 344).

On June 12, 2012, Dr. Noyes again saw Plaintiff for a follow-up appointment and issued

6

an impairment rating. (*Id.* at Tr. 576, PAGEID #: 615). Dr. Noyes stated that Plaintiff again "appear[ed] on crutches with marked functional deficits," despite the fact that he had seen Dr. Akbik the same day without crutches. (*Id.* at Tr. 478, 576; PAGEID #: 517, 615). Further, Dr. Noyes stated Plaintiff had a 20% lower extremity impairment and accordingly found he was not able to "within a reasonable degree of medical certainty to return as a police officer." (*Id.* at Tr. 576, PAGEID #: 615).

Plaintiff underwent a right lumbar sympathetic plexus block by Dr. Akbik on August 8, 2012, and again on September 17, 2012. (*Id.* at Tr. 613, 676, PAGEID #: 652, 715). In a subsequent appointment with Dr. Akbik on October 17, 2012, Dr. Akbik again stated that Plaintiff's gait was steady and he was able to do a heel/toe gait. (Doc. 9-7, Tr. 737, PAGEID #: 777). Plaintiff reported at that appointment that he hadn't noticed any relief from the nerve blocks. (*Id.*).

On September 5, 2013, Dr. Noyes submitted a summary of Plaintiff's treatment and stated "this patient does have a pain syndrome out of proportion to what one would expect based on the pathology." (*Id.* at Tr. 749, PAGEID #: 789).

### D. The ALJ's Decision

The ALJ found that Plaintiff suffered from the following severe impairments: osteoarthritis of the right knee; sprains and strain of the right knee, leg, hip and thigh; status post knee surgery times two; and complex regional pain syndrome/reflex sympathetic dystrophy with associated saphenous neuropathy. (Doc. 9-1, Tr. 39, PAGEID #: 73). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.*).

7

According to the ALJ, after considering Plaintiff's osteoarthritis and sprains and strains of the right knee/leg pursuant to section 1.02A of the listing of impairments, the claimant did not meet the listing level severity. (*Id.* at Tr. 39–40, PAGEID #: 73–74). Specifically, the ALJ stated that:

> [Plaintiff] does not have a major dysfunction of a joint(s) (due to any cause), characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankyloses, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affect joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankyloses of the affect joint(s), with A) involvement of one major peripheral weight-bearing joint (i.e. hip, knee or ankle) resulting in inability to ambulate effectively, as defined in 1.00B2b.

(*Id.*). Further, the ALJ concluded that Plaintiff's complex pain syndrome/reflex sympathetic dystrophy with associated saphenous neuropathy failed to meet "section 11.00 of the listing of impairments, which deals with neurological impairments," because he did not "not have a disorganization of motor functions as described in section 11.04B." (*Id.* at Tr. 40, PAGEID #: 74).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ stated:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that he requires a sit/stand option with allowance to alternate sitting or standing positions for up to two minutes, at 30-minute intervals without going off-task. He should never operate foot controls with his right foot. The claimant should never climb ladders, ropes or scaffolds, kneel, crouch or crawl. He can occasionally climb ramps and stairs, balance, and stoop. He should avoid concentrated exposure to extreme cold and heat, wetness, and humidity. The claimant should avoid all exposure to unprotected heights, hazardous machinery and commercial driving. He is limited to performing simple, routine and repetitive tasks requiring only simple decisions, with no fast-paced production requirements and few workplace changes because of medication side effects and pain.

(*Id.*). In making this determination, the ALJ explained that he considered all symptoms "and the

8

extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence," as well as considering opinion evidence.  (*Id.*).

In terms of the weight given to different physicians, the ALJ did not give significant weight to Dr. Noyes' opinion that Plaintiff would not be able to do a sitting job, because Dr. Noyes himself indicated this was temporary and explained Plaintiff should be able to do a sitting job in the near future.  (*Id.* at Tr. 48, PAGEID #: 82).  Similarly, Dr. Noyes' opinion that Plaintiff could not work due to his severe pain was not given significant weight because, again, it was temporary in nature and Plaintiff had not begun his treatment with Dr. Akbik yet.  (*Id.* at Tr. 50, PAGEID #: 84).  The ALJ noted that Dr. Noyes opined later, on June 12, 2012, that Plaintiff could not return to work as a police officer.  (*Id.* at Tr. 52, PAGEID #: 86).  This opinion was given controlling weight, as Dr. Noyes was Plaintiff's treating physician and it was "consistent with the objective medical signs and findings in the record."  (*Id.*).  Finally, Dr. Pinksy's opinions on Plaintiff's restrictions were given "limited weight," because he evaluated Plaintiff on only one occasion and "additional evidence in the record [did] not indicate that the claimant [was] precluded from all standing and walking."  (*Id.*).

The ALJ also stated that Plaintiff's statements concerning the intensity, persistence and limiting effects" of his alleged symptoms were "not entirely credible."  (*Id.* at Tr. 54, PAGEID #: 88).  Accordingly, the ALJ found Plaintiff to be "only partially credible."  (*Id.*).

Relying on these and other considerations, the ALJ ultimately concluded that while Plaintiff was unable to perform any past relevant work, in considering Plaintiff's age, education, work experience, and RFC, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  (*Id.* at Tr. 56, 58, PAGEID #:

9

90, 92).  The ALJ therefore found Plaintiff was not disabled and denied benefits.  (*Id.* at Tr. 58, PAGEID #: 92).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."  *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

## III.    DISCUSSION

In his statement of specific errors, Plaintiff argues that: (1) the ALJ's decision failed to properly consider whether Plaintiff met or equaled Listing 1.02A (Doc. 10 at 6); and (2) the ALJ's RFC does not account for a critical work preclusive limitation.  (*Id.* at 12).

### A.  Whether the ALJ Properly Considered Whether Plaintiff Met or Equaled Listing 1.02A

Plaintiff asserts that the ALJ's evaluation of whether or not his osteoarthritis of the right knee met or equaled Listing 1.02A was "merely a recitation of the listings requirements and a conclusory statement that they had not been met."  (Doc. 10 at 6).  In particular, Plaintiff claims that he presented enough evidence relating to every element of Listing 1.02A to warrant a more detailed evaluation than the one performed by the ALJ.  (*Id.* at 11).

If a claimant's impairment meets the description of a Listing or its equivalent, the claimant will be found disabled. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "A claimant bears the burden of demonstrating that he meets or equals a listed impairment at the third step of the sequential evaluation." *Bluer v. Comm'r of Soc. Serv.*, No. 1:13-CV-22, 2014 WL 700424, at *4 (W.D. Mich. Feb. 24, 2014) (citing *Evans v. Sec'y of Health & Human Services*, 820 F.2d 161, 164 (6th Cir.1987)); *see also Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) (stating that "Plaintiff had the burden of showing that his impairments were equal or equivalent to a listed impairment.").

First, it is worth noting that Plaintiff did not argue that his osteoarthritis of the right knee met or equaled Listing 1.02A at his administrative hearing, even though he was represented by counsel at that time. Instead, Plaintiff's counsel argued his sole impairment was residual complex regional pain syndrome with associated saphenous neuropathy. (Doc. 9-1, Tr. 68, PAGEID #: 102). Nevertheless, the ALJ still addressed, and "expressly found that [Plaintiff] did not have an impairment or combination of impairments that was equal or equivalent" to Listing 1.02A. *Malone*, 507 F. App'x at 472.

Second, "the Sixth Circuit has concluded that the failure by an ALJ to provide extensive reasoning at step three is not, by itself, grounds for relief." *Chappell v. Comm'r of Soc. Sec.*, No. 1:14-CV-1005, 2015 WL 4065261, at *3 (W.D. Mich. July 2, 2015) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014). The claimant in *Forrest* contended, as Plaintiff does here, that "the ALJ's sparse step-three analysis" required remand because, *inter alia*, "the ALJ's failure to explain his findings preclude[d] substantial-evidence review." 591 F. App'x at 364. In addressing the argument, the Sixth Circuit emphasized that "the regulations governing

11

the five-step inquiry require only that the ALJ 'consider all evidence in [the claimant's] case record,' 20 C.F.R. § 404.1520(a)(3), and, at step three, 'consider the medical severity of [the claimant's] impairment(s),' *id.* § 404.1520(a)(4)(iii)." *Id.* at 365. The Sixth Circuit ultimately concluded in *Forrest* that the ALJ "made sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Id.* at 366 (citing *Bledsoe v. Barnhart*, 165 F. App'x. 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a second time").

Here, when looking at the ALJ's twenty-two page opinion it its entirety, the Court is satisfied that the ALJ considered all the evidence in the record and considered the medical severity of Plaintiff's impairments in determining he did not meet Listing 1.02. In fact, the ALJ description of Plaintiff's medical background was painstakingly detailed, even including every doctor Plaintiff saw before his alleged onset date and explaining Plaintiff's symptoms and doctor's appointments after the date last insured. (Doc. 9-1, Tr. 42–54, PAGEID #: 76–88).

Further, despite Plaintiff's contentions that "[t]he ALJ completely disregarded [Plaintiff's] need to use crutches," the record shows otherwise. The ALJ's questioning during the hearing demonstrated that he was particularly attuned to whether or not Plaintiff could "ambulate effectively," as did his frequent discussion throughout his opinion of Plaintiff's use of crutches at times. (*See id.* at Tr. 47, PAGEID #: 81) ("The claimant used a wheelchair and crutches to ambulate at the start of therapy;" "The claimant reported continued use of crutches and a right knee brace"); (*id.* at Tr. 48, PAGEID #: 82) ("He still wore a range of motion brace and ambulated with crutches; "he was now full weight bearing and out of his brace. He still used

crutches."). These frequent references by the ALJ to Plaintiff's crutches show that he did anything but disregard this fact. Instead, the ALJ just disagreed with Plaintiff and found that (1) there was no indication that crutches were prescribed after Plaintiff recovered from surgery, (2) the state agency medical consultant did not opine that the claimant required crutches, and (3) Dr. Akbik noted on multiple occasions that Plaintiff had a normal gait and could walk independently. (*Id.* at Tr. 56, PAGEID #: 90). Moreover, the ALJ found "it notable that Dr. Akbik recommended to [Plaintiff] that he seek vocational rehabilitation as opposed to disability, which would indicate that he believed" Plaintiff could still work. (*Id.*). Although this discussion occurred throughout the opinion, rather than just in the portion of the opinion discussing why Plaintiff did not meet Listing 1.02, the Court is satisfied that these factual findings throughout the decision support the ALJ's conclusion at step three.

While Plaintiff points to the fact that Dr. Noyes opined on June 23, 2014, in an opinion submitted to the Appeals Council, that Plaintiff's crutches were necessary for ambulation (Doc. 9-1. Tr. 33, PAGEID #: 67), the Sixth Circuit has repeatedly held that such evidence may not be considered for purposes of substantial-evidence review. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (holding that evidence submitted a month after the ALJ's decision was irrelevant and could not justify a remand because "[t]he court is confined to review evidence that was available to the Secretary, and to determine whether the decision of the Secretary is supported by substantial evidence"). In this case, substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 1.02.

### B. Whether the RFC Accounted for a Critical Work Preclusive Limitation

Next, Plaintiff argues that the ALJ omitted an important limitation in creating his residual

functional capacity that, if incorporated, would have resulted in a finding of disabled.  (Doc. 10 at 12).  Specifically, Plaintiff argues that the ALJ completely disregarded the fact that Dr. Pinsky precluded him from squatting, which makes "it is impossible to determine if the ALJ ignored, rejected, or overlooked this contrary limitation."  (*Id.* at 13–14).

However, the ALJ did not ignore Dr. Pinksy's restrictions.  In fact, the ALJ specifically acknowledged that Dr. Pinksy "opined that the claimant should never reach below the knee, push, pull, squat, kneel, stand or walk."  (Doc. 9-1, Tr. 52, PAGEID #: 86).  This opinion, however, was afforded only "limited weight" by the ALJ, in part because Dr. Pinsky examined Plaintiff only one time and his opinions were not supported by additional evidence in the record. (*Id.*).  Other evidence in the record showed Plaintiff could in fact squat.  For example at a physical therapy appointment on October 25, 2011, it was noted that "patient was able to do 20 repetitions on right lower extremity exercises and wall squat."  (Doc. 9-6, Tr. 399, PAGEID #: 438).  Again on November 3 and November 11, 2016, physical therapy notes stated Plaintiff's started doing mini-squats which he "tolerate[d] well."  (*Id.* at Tr. 394, 396, PAGEID #: 433, 435).

Accordingly, the ALJ properly mentioned and refuted Dr. Pinsky's opinion.  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) ("In rendering his RFC decision, the ALJ . . . may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.") (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  Plaintiff may disagree with

14

the ALJ's decision to discredit a doctor that believed Plaintiff should not squat, but the relevant legal standard is not whether this Court agrees with the ALJ's decision to choose one source's opinion over the others.  *See Mullins v. Sec'y of HHS*, 836 F.2d 980, 984 (6th Cir. 1987) (noting that "the weight to be given opposing medical opinions" is "clearly not a basis for setting aside the ALJ's factual findings").  Thus, because the ALJ did not ignore Dr. Pinksy's opinion and substantial evidence supports the ALJ's RFC decision, it must be upheld.  *See Henry v. Comm'r of Soc. Sec.*, 973 F. Supp. 2d 796, 802 (N.D. Ohio 2013) ("The ALJ's decision not to make additional limitations on Henry's residual functional capacity is supported by substantial evidence in the record.").

## IV.    CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the

right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date:  March 10, 2017                          /s/ Kimberly A. Jolson
                                               KIMBERLY A. JOLSON
                                               UNITED STATES MAGISTRATE JUDGE